In re Leo H. TELLIER, Debtor.

Leo H. TELLIER, Plaintiff,

v.

FLEET NATIONAL BANK, Defendant.

Bankruptcy No. 90–12234.
Adv. No. 90–1176.

United States Bankruptcy Court,
D. Rhode Island.

Oct. 27, 1992.

---

George M. Prescott, Lincoln, R.I., for debtor/plaintiff.

Robert D. Wieck, MacAdams & Wieck Inc., Providence, R.I., for defendant.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard over the course of 14 trial days during January, February, March, and April 1992, on three related matters: Fleet National Bank's Motion for Relief from Stay; Leo Tellier, the Debtor's, Second Amended Complaint asserting lender liability causes of action against Fleet for compensatory and punitive damages; and Tellier's motion for discovery sanctions against Fleet. We reserved ruling on all of the above until completion of the adversary proceeding, which was the most time consuming of the three. Having received and considered the requested post-trial memoranda, this protracted and over-litigated dispute is now ready for decision.

## I. BACKGROUND AND OPERATIVE FACTS

At all relevant times, Leo Tellier was a real estate developer and speculator. In March 1984, Fleet granted Mr. Tellier an installment loan which was secured by a mortgage on a multi-unit apartment building located on Manville Hill Road in Cumberland, Rhode Island.

The subject business relationship originated on November 21, 1986, when Tellier established a so-called "Westminster Account" with Fleet, and two weeks later deposited $381,788.06 into the account. Pursuant to the terms of the Westminster Account agreement, Fleet obligated itself to, and did purchase registered securities with these funds on Tellier's behalf. Also under the Westminster Account agreement, Tellier had access to various other credit and borrowing facilities, and on December 24, 1986, his line of credit was increased from $50,000 to $150,000.

During the next two years, Fleet agreed to finance several real estate transactions for Tellier, among them: A $60,000 loan secured by a mortgage on a quarter timeshare unit in Jamestown, Rhode Island; a

$100,000 home equity loan secured by a mortgage on a Jamestown condominium unit; a $100,000 loan secured by a mortgage on a Lincoln, Rhode Island, condominium unit; an $85,000 loan secured by a Revere, Massachusetts, condominium unit; a $100,000 loan secured by property located in Woonsocket, Rhode Island; a $250,000 loan secured by an equity mortgage on the Manville Hill Road property, plus a pledge of all assets in Westminster Account.

In the late 1980's, with things worsening economically for both Tellier and the bank,[1] it became necessary to use the proceeds of many of these loans to bring Tellier's lines of credit within 50% of the value of his assets, and on May 23, 1989, Tellier met with Fleet officials Mariana Sequeira, Robert Esau, Nancy Davis, and Peter Hunt to discuss and resolve a $70,000 over-line on Tellier's asset-based Westminster Account line of credit. As a result of the meeting, Fleet agreed to permit a temporary $100,000 over-line, in reliance on Tellier's representations that the sale of his Pawtucket property and the Manville Hill Road property were imminent, and that the proceeds of said sales would be used to cure the over-line.

In July 21, 1989, Tellier again met with Sequeira and Esau. By that time, Tellier owed approximately $653,000 in commercial loans to Fleet. His asset-based and home equity lines of credit had outstanding balances of $232,000 and $100,000 respectively, and the market value of his Westminster Account assets was $325,000. At this meeting, Tellier, expecting that he would net approximately $90,000 after payment of the Westminster Account loans, requested that his Westminster Account assets be liquidated. Tellier also agreed that Fleet would reserve $54,000 of the proceeds in a so-called manual money market account. It was estimated that the $54,000 would be sufficient to handle the debt service on his remaining commercial loan obligations for approximately six months. In January, 1990, the balance in the money market account was down to $26,000, Tellier's total indebtedness to Fleet was up to $740,000, and income from the properties collateralizing Fleet's loans was producing a negative annual cash flow of $125,000.

On February 28, 1990, Tellier executed a purchase and sale agreement with Joseph and Aurora Almeida for the Manville Hill Road property in the amount of $1,550,000, with a financing contingency of $1,162,500, and he so advised Fleet. On July 2, 1990, however, *without informing Fleet*, Tellier sold the Manville Hill Road property to the Almeidas, taking back a wrap-around mortgage. Then at a status meeting on July 20, 1990, in response to a direct question, Tellier falsely reported to Fleet that he had not yet sold the Manville Hill Road property. Also, updated cash flow reports, although promised, were not forthcoming. In September, 1990, during the performance of a routine title search, Fleet discovered that Tellier had sold the Manville Hill Road property to the Almeidas. When confronted about this, Tellier essentially told Ann Gallagher that this transfer was really of no concern to her, and that as long as Fleet was receiving current payments on its mortgage, she should not be concerned about the sale. This event is what appears to have triggered the beginning of the end of Fleet's willingness to be patient with Leo Tellier.[2]

The $250,000 note secured by the Manville Hill Road property provides that an event of default would occur, permitting Fleet to accelerate the indebtedness, upon the occurrence of several events including,

1. In the late 1980's the Bank, Tellier, and many others in the same type of business became victims of the collapsing New England real estate market. This increasingly common scenario gave rise to countless similar instances where the bank helplessly watched its security become less valuable by the day, while its debt grew—the result of the inability of over-extended debtors to service their obligations to, by now, undersecured lenders.

2. While that likelihood is not totally relevant to our deliberations here, it appears that Tellier's complete lack of remorse in the circumstances is probably what incurred the considerable wrath of Ann Gallagher (which Tellier grossly underestimated), and raised the level of bitterness in this case to where it is.

the "acquisition at any time or from time to time of (legal or equitable) title to the whole or any part of the property which is security for this note by any person, partnership or corporation other than Leo H. Tellier, Jr."

The mortgage also provided that if all or any part of the property was transferred by the borrower without the lender's prior written consent, the lender could then, at its option, require immediate payment in full of all sums then due. It was further provided that Fleet could not exercise this option if, "(a) borrower causes to be submitted to lender information required by lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) lender reasonably determines that lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this security instrument is acceptable to lender." Here, of course, Tellier did not request that Fleet consider an assumption by the Almeidas of the Fleet mortgage, nor did he ever discuss such an assumption with the Almeidas.

On October 1, 1990, the $60,000 loan dated September 2, 1987 matured, and the entire principal balance together with accrued interest was due and payable. Tellier did not tender the outstanding balance due on the note on or before its maturity date, or at any time thereafter.

As a result of the various defaults under its loans including the cross-default provisions contained in the loan documents, Fleet accelerated all of Tellier's indebtedness, and so notified him by letter dated October 10, 1990.

On or about October 12, 1990, Tellier, through his attorney, George Prescott, Esq., tendered the unpaid principal balance due under the $60,000 note, but on the condition that Fleet "de-accelerate" all of the other obligations of Tellier to Fleet. In his offer of tender, Mr. Prescott also requested copies of all of the loan documents between Fleet and Tellier.

On October 18, 1990, Fleet rejected Tellier's request that it not accelerate the debt, but did provide Prescott with copies of the requested loan documents.

In late October 1990, Tellier met with Ann Gallagher and Dan Williams of Fleet to discuss impending foreclosure sales. The meeting was arranged through an intermediary on behalf of Tellier, and took place shortly before he was to leave on an extended vacation. During this meeting, Tellier never specifically requested that Fleet cancel the foreclosure notices which were scheduled to appear in the newspapers, nor did Fleet commit to cancel or continue those advertisements. Fleet, through Dan Williams, did agree to "work with Tellier in an effort to resolve these problems," and in that regard requested updated financial statements, tax returns and updated cash flow statements.

On or about November 13, 1990, while Tellier was still away on vacation, foreclosure notices appeared in the Providence Journal and Woonsocket Call, advertising scheduled mortgagee's sales of the various properties securing Tellier's loans with Fleet. It was only through these foreclosure notices that the Almeidas became aware that Fleet was foreclosing its mortgage on *their* property. Immediately upon learning of Fleet's intentions, the Almeidas initiated their own discussions with Fleet regarding financing of the Manville Hill Road property.

When his vacation trip ended Tellier met again with Ann Gallagher and Dan Williams, and expressed surprise and anger that foreclosure notices had appeared in the newspapers. During the ensuing period while both Tellier and the Almeidas were discussing the Manville Hill Road problem with Fleet, Tellier refused to participate in any joint meeting involving the Almeidas.

As a result of discussions directly with the Almeidas, however, Fleet agreed to extend financing to them in the amount of $1,000,000, provided that the loan be secured by a first mortgage on the Manville Hill Road property, and by a mortgage on other property owned by the Almeidas. Since Fleet would commit to loan the Almeidas only $1,000,000, maximum, they

could accept Fleet's proposal only if: (a) they either paid to Tellier the difference between the outstanding balance of their note to Tellier and $950,000; or (b) Tellier agreed to subordinate his mortgage on the property. Neither option occurred.

During the latter part of November 1990, Tellier and Ann Gallagher had ongoing discussions regarding a possible forbearance agreement as to the pending foreclosure sales. In that regard, Gallagher delivered a letter to Tellier on or about November 21, 1990, outlining the terms of a proposed forbearance agreement which would be acceptable to Fleet. This proposal never came to fruition, either. Nevertheless, in order to keep alive the possibility of the Almeidas' refinancing, the Tellier foreclosure sales were adjourned from December 5, until December 12, 1990, and again until December 19, 1990.

On December 14, 1990, before the parties could meet as scheduled, Tellier filed his voluntary Chapter 11 petition, and on the same date he filed a Complaint seeking to permanently enjoin the foreclosure of the Manville Hill Road property. On the same date, Tellier filed a Motion for Temporary Restraining Order, seeking an immediate injunction against the foreclosure of the Manville Hill Road property. On December 18, 1990, we granted Tellier's Motion for a Temporary Restraining Order and scheduled a hearing on Preliminary Injunction for December 27, 1990. At the same time, the Manville Hill Road foreclosure sale scheduled for December 19, 1990 was adjourned until January 3, 1991.

At the hearing on Preliminary Injunction held on December 27, 1990, the parties agreed to adjourn the Manville Hill Road sale until January 15, 1991, with the expectation that during the adjournment the Almeidas would complete their refinancing with Fleet. On December 31, 1990, Fleet issued its commitment letter, which was accepted by the Almeidas on January 4, 1991.

3. *See, e.g., Dodge v. Stone,* 76 R.I. 318, 69 A.2d 632 (1949) (agent must exercise a high standard

On January 4, 1991, Fleet and the Almeidas completed the Manville Hill Road sale, paying off certain Tellier notes and placing excess proceeds of approximately $190,000 in escrow, pending a hearing on Fleet's Motion for Adequate Protection, wherein it sought payment of the entire $190,000. After hearing on January 15, 1991 and January 23, 1991, we denied Fleet's Motion for Adequate Protection. *See In re Tellier,* 125 B.R. 348 (Bankr.D.R.I.1991). Although we denied Fleet's specific request for relief, we did condition the Debtor's use of the $190,000 as follows: (a) that Tellier pay Fleet $25,000, to be applied to the Jamestown quarter-time share note; (b) that Tellier pay Fleet the sum of $20,000, to be applied to the Revere note; and (c) that all post-petition arrearages be cured on or before April 30, 1991. *Id.* at 350.

This adversary proceeding was originally commenced by Tellier solely to enjoin Fleet from foreclosing its mortgage on the Manville Hill Road property. Tellier has since amended his complaint twice, to include claims for breach of fiduciary duty, and praying for compensatory and punitive damages.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Tellier advances numerous arguments in his post-trial memorandum, which we address below, in the order presented by him.

1. Fleet is a fiduciary of Tellier and as such owes a corresponding duty, the breach of which constitutes constructive fraud.

█ Tellier admits that the Westminster Account agreement specifically provides that the agreement "establishes an account and an agency relationship (and not a trust relationship)." However, he maintains that despite this distinction a trust relationship exists anyway. For support, he cites *Cahill v. Antonelli,* 120 R.I. 879, 390 A.2d 936 (1978). We do not quarrel with Tellier's references to Rhode Island case law which defines the standard of good faith owed by agents to principals,[3] nor with the

of honor and avoid transactions which call into question his good faith); *Kessler v. Bishop,* 51

fact that *Cahill* seems to suggest that under Rhode Island law the existence of an agency relationship creates a fiduciary relationship between agent and principal. Tellier's problem, however, lies in the difference between the facts in *Cahill* from those in the case at bar. In *Cahill*, the court first found the existence of a fiduciary duty from brother to sister, and a breach of that duty where the brother, who had always been viewed as the "nominal head of the family," withheld reconveying the family property to the sister, as promised, for his own "personal gain." *Cahill*, 390 A.2d at 939. As a result, the Court found that a constructive trust was established. Here, with knowledgeable parties engaged in business and dealing at arm's length, there is no room to find such a level of trust and confidence between Fleet and Tellier as is appropriate in the familial context. Moreover, although *Cahill* might suggest otherwise, fraudulent conduct continues to be an essential element to the establishment of constructive trusts.

In this proceeding, Tellier is charged with a level of sophistication in the real estate business and financing which belies the argument that he was an unwitting victim of Fleet's overzealous investment and lending strategies. Although Tellier did elect to have Fleet act as securities nominee and authorized it to direct his investment portfolio, the evidence establishes that it was not poor or improper investment practices by Fleet, but Tellier's mounting borrowing and liquidity problems, as reflected in the declining real estate market, that led to the diminution of his once robust account.

2. Fleet wrongfully applied the securities in Tellier's Westminster Account as collateral for loans, and used the proceeds to purchase additional securities.

■ Tellier now concedes that there is no private cause of action for so-called "Reg–U" [4] securities violations, as earlier alleged by him, *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir.1985), *cert.*

denied, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), but nevertheless urges the Court to consider such violations as *some evidence* of Fleet's bad faith in dealing with him. At least six times, Fleet used the proceeds of advances against Tellier's asset based line of credit from his Westminster Account to purchase securities in his behalf. These margin loans are governed by 12 C.F.R. § 221.3. Tellier argues that although he signed the Reg–U forms in blank when he opened his account, Fleet's failure to complete those forms when the margin loans were made, is evidence of Fleet's self dealing and bad faith. We cannot agree. Although Fleet *may have* violated certain securities regulations (and as to this we volunteer no opinion either way), there is no basis to translate such violations into bad faith by Fleet in the context of this litigation, since Tellier knew from the beginning that by signing the forms, periodic margin purchases would be made.

3. Fleet routinely allowed the balances of the asset based loans associated with Tellier's Westminster Account to exceed applicable federal regulations, and its own policy.

■ The evidence does support the allegation that on numerous occasions the loan to value ratio of the asset based borrowing in Tellier's account exceeded the maximum loan value set out in 12 C.F.R. § 221.8 (50% of the market value of his securities), and that Fleet's standard policy was to remain within those limits. However, it was Tellier who continued to request loans for various purposes throughout the course of his business relationship with Fleet, and we find it difficult to reconcile Fleet's accommodation of Tellier's requests, with the bad faith now ascribed to Fleet by Tellier. Again, without so ruling, although Fleet *may* be guilty of unrelated securities violations herein, its conduct is neither action-

---

R.I. 202, 153 A. 247 (1931) (duty of agent to act with utmost good faith for best interest of principal).

**4.** Federal Reserve System Board of Governors' regulations governing margin loans. 12 C.F.R. § 221.3(b) and (c).

able by Tellier nor evidence of Fleet's alleged self dealing vis-a-vis this borrower.

4. Fleet wrongfully enticed Tellier to borrow $250,000 on November 21, 1988, and wrongfully took a pledge of all the securities in Tellier's Westminster Account as collateral.

This one is easy. Tellier knowingly signed the pledge agreement upon receiving the $250,000, with no evidence of coercion or other misconduct by Fleet. Tellier's arguments are specious and not actionable, especially at the level of sophistication which we have attributed to him.

5. Fleet wrongfully withheld $54,000 of Tellier's funds in an account to which he had no access.

This is another puzzling, unproved allegation. This arrangement was agreed to by Tellier; his own testimony does not indicate otherwise. Fleet permitted Tellier to use the proceeds from the liquidation of the Westminster Account for other debt service rather than holding it as collateral for the $250,000 note. Fleet at this point was effectively (and not improperly) in control of the remaining assets by virtue of the pledge and other security instruments.

6. Fleet wrongfully accelerated all of Tellier's mortgage loans and wrongfully commenced foreclosure of his properties.

■ The Adjustable Rate Rider incorporated in the mortgage given by Fleet on the Manville Hill Road property provides:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred ... without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender ... if: '(a) Borrower causes [sic] be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the N[o]te and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Exhibit 17 at 9–10.[5]

Tellier contends that this language, in addition to 12 U.S.C. § 1701j–3(b)(3), imposes an affirmative duty on Fleet to consider an assumption of the loan obligation by a third party (the Almeidas).[6] Assuming ar-

---

5. The terms of the promissory note clearly make Tellier's transfer to the Almeidas an event of default. "Acquisition at any time or from time to time of (legal or equitable) title to the whole or any part of the property which is security for this note by any person, partnership, or corporation other than Leo H. Tellier, Jr." would trigger "the entire balance outstanding ... and all other liabilities ... shall at the option of the lender, becom[ing] forthwith due and payable" at the Lender's option. Exhibit 17 at 3–4.

6. 12 U.S.C. § 1701j–3(b)(2) provides that a lender's exercise of its option pursuant to a due on sale clause is to be governed exclusively by the contract, which terms and conditions are to be fixed and governed by the contract. *Id.* At subsection (b)(2), a lender is merely *"encouraged to permit an assumption* of a real property

guendo the correctness of this argument, Tellier never brought this contemplated assumption to Fleet's attention prior to the transaction, nor at subsequent meetings with Fleet employees. Fleet cannot be charged with such a duty where Tellier was deliberately concealing material facts, and his clandestine transfer to the Almeidas was an event of default which cannot now be used offensively against Fleet.

■ With respect to the Jamestown loan, Tellier argues that there was a ten day grace period after maturity within which to pay that loan. By the terms of the note, Fleet had the right to accelerate ten days after a payment due date, if such payment was not made. The grace period, however, does not apply to payments due on maturity, since acceleration is not required *after* maturity. Tellier has never tendered to Fleet the sums required to pay off either indebtedness.

7. Fleet violated the automatic stay, 11 U.S.C. § 362, by rescheduling the foreclosure of the Manville Hill Road property after the filing of the petition in this Chapter 11 case.

■ We disagree initially with Fleet that it is not a violation of § 362(a) to foreclose its mortgage interest on property in which Tellier no longer had a fee simple interest. Although Fleet is correct that Tellier's cited case was ultimately vacated, *see Coben v. Hahn (In re Golden Plan of California, Inc.),* 39 B.R. 551 (Bankr. E.D.Cal.1984), *vacated,* 72 B.R. 205 (Bankr. E.D.Cal.1986), other authority exists for the proposition that § 362(a) protects Tellier's junior mortgage interest from foreclosure by Fleet. *See Cardinal Indus., Inc. v. Buckeye Fed. Sav. & Loan Ass'n (In re Cardinal Indus., Inc.),* 105 B.R. 834, 855 (Bankr.S.D.Ohio 1989).

Notwithstanding the foregoing academic discussion, however, we find that Fleet's action in rescheduling the foreclosure sale and in opposing Tellier's timely request for a temporary restraining order and preliminary injunction in December 1990, was not made in bad faith, nor did it violate the

stay. The First Circuit has held that postponement of a foreclosure sale for a month at a time after a debtor's filing does not violate the automatic stay. *Lugo v. De Jesus Saez (In re De Jesus Saez),* 721 F.2d 848, 853 (1st Cir.1983), *accord Tome v. Baer (In re Tome),* 113 B.R. 626, 630 (Bankr.C.D.Cal.1990). Moreover, Tellier was successful in obtaining a Temporary Restraining Order, and ultimately his complaint for injunctive relief with Fleet was resolved through Fleet's refinancing with the Almeidas. *See* Consent Order, A.P. No. 90–1176 (Jan. 4, 1991). As a result, we reject Tellier's argument on this point because: (1) it is legally incorrect; (2) it is moot.

8. Fleet wrongfully attempted to obtain proceeds from the refinancing of the Manville Hill Road property after the filing of the petition in this case.

■ On April 5, 1991, after hearing, we denied Fleet's Motion for Adequate Protection, but conditioned that denial upon Tellier's payment to Fleet of $25,000 to be applied to the Jamestown loan, an additional $25,000 to be applied to the Revere loan, as well as payment of all post petition arrearages. *See In re Tellier,* 125 B.R. 348, 350 (Bankr.D.R.I.1991). The merits of that dispute were resolved by that decision, which in effect gave certain relief to each party; they may not be the basis for a separate cause of action here.

9. Fleet wrongfully filed false and misleading responses to Tellier's discovery.

Because of Fleet's and/or it's counsel's less-than-forthcoming behavior during the extensive discovery conducted in this proceeding, we have already ruled on August 8, 1991 that sanctions were appropriate. We address the amount of those sanctions in Part IV *infra,* in response to Tellier's motion on that point.

10. Tellier should be awarded compensatory and punitive damages for Fleet's alleged bad faith.

■ Tellier claims he was deprived of the use of the $54,000 held in reserve by

loan at [or near] the existing contract rate...."

12 U.S.C. § 1701j–3(b)(3) (emphasis added).

Fleet, and should recoup $12,493 in commissions and fees charged by Fleet, as well as his attorney's fees. For punitive damages, Tellier seeks an award of 1% of Fleet's equity capital, which would amount to $3,157,000, to deter Fleet from such conduct in the future.

■ Since Tellier has produced no persuasive evidence of actual damages sustained as a result of Fleet's alleged wrongdoing, there is no compensatory predicate to an award of punitive damages.[7] Additionally, punitive damages, by definition, are intended to punish the tortfeasor whose wrongful act was intentional or malicious, and to deter similar extreme conduct. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Under Rhode Island law, a plaintiff seeking punitive damages must demonstrate that the defendant acted with malice, wantonness, or wilfulness of such an extreme nature as to amount to criminality. *T & S Serv. Assocs., Inc. v. Crenson*, 505 F.Supp. 938, 945–46 (D.R.I.1981), *vacated on other grounds*, 666 F.2d 722, 728 (1st Cir.1981); *Morin v. Aetna Casualty & Sur. Co.*, 478 A.2d 964, 967 (R.I.1984); *Sherman v. McDermott*, 114 R.I. 107, 329 A.2d 195, 196 (1974). The District Court has interpreted this "criminality" standard to mean *"intentional* conduct that is *malicious." Regan v. Cherry Corp.*, 706 F.Supp. 145, 153 (D.R.I.1989) (emphasis in original). Notwithstanding the acrimony on both sides of this dispute, the facts do not warrant such findings, and, therefore, a punitive damage award is not authorized.

Accordingly, claims one through six of Tellier's second amended complaint are DENIED.

### III. FLEET'S MOTION FOR RELIEF FROM STAY

On November 5, 1992, Fleet moved for relief from the automatic stay with respect to five properties. On two of those properties, the Wake Robin Condominium in Lincoln and the Providence Street, Woonsocket, property, Fleet withdrew its request for relief, without prejudice, on the representation that Tellier would bring the bank current on its loans. On two others, the ¼ time share in Jamestown and the Revere Beach condominium, the parties have entered a consent order, granting Fleet relief from the stay. On the one remaining property, the Conanicus Avenue, Jamestown condominium, Tellier agrees that $219,-729.58 is due ($107,285.58 associated with Fleet's second position mortgage), but he disputes the alleged lack of equity in the property. On this issue, we heard the testimony of Fleet's appraiser, Katherine Finney, and that of Leo Tellier, in his own behalf. We also admitted into evidence the written appraisal of William Coyle.

■ Finney's first appraisal of the property was done in January 1991, which based upon three comparable sales indicated a fair market value of $200,000. An appraisal by Finney dated December 1991 shows a decrease in value to $170,000, representing depreciation of 15%, based on more recent comparable sales. On cross examination, it was revealed that the witness was in error regarding the identification of the units, but on redirect examination Finney indicated that the units were sufficiently fungible so that her appraisal would not change. We accept Finney's explanation, and Tellier's motion to strike her testimony (which we did not rule on at trial) is DENIED.

■ Notwithstanding his bias and interest in the outcome of this litigation, we allowed Tellier to testify as an expert, based on his experience as a former tax assessor, broker, and appraiser. He valued the property at $225,000, which would give him a $6,000 equity cushion. Coyle's appraisal indicated a value of $210,000.

Based upon all the available appraisals, and the testimony regarding each of them, we conclude that the market value of the property in question is $190,000. Because

---

**7.** Tellier presented the expert testimony of Arthur F. LeBeau, a retired senior bank vice-president with 32 years of banking experience. LeBeau testified that bankruptcy places a stigma on debtors. However, on cross-examination, he admitted that banks are willing to finance debtors-in-possession.

there is no evidence of necessity to an effective reorganization, we resolve the matter solely on the equity issue. Accordingly, based on a lack of equity in the property, and with no showing of necessity to an effective reorganization Fleet's motion for relief from stay as to the Conanicus Avenue, Jamestown, unit is GRANTED.

## IV. TELLIER'S REQUEST FOR SANCTIONS

 Without question, Fleet and/or its counsel are responsible for much unnecessary discovery in this case. Tellier was required to move to compel production of documents after Fleet failed to produce Westminster Account statements, meeting memoranda, and answers to interrogatories (see A.P. docket ## 18–20).

Tellier was also required to move for imposition of discovery sanctions (A.P. docket #19), and on August 8, 1991, after a long hearing, we granted Tellier's motion to compel Fleet to answer "interrogatory 16," and granted his motion for sanctions, reserving decision, until now, as to the amount. We requested proposed findings and conclusions, and received the same from both parties, as well as objections to each. Appropriate orders disposing of the discovery matters having been entered pretrial, the only remaining issue is the reasonableness of the costs to be allowed for Fleet's intentional abuse and obstruction of the discovery process.

We note initially that Fleet and/or its counsel should have avoided the necessity for this motion had it (they) been more forthcoming throughout the discovery process. Although we have already ruled on the propriety of sanctions, an example of Fleet's recalcitrance is helpful here. After repeatedly being asked for "memos," Mariana Sequeira insisted that credit memoranda or other memoranda were not to be construed as "memos," as justification for Fleet's discovery responses given under oath, as follows: "No memorandum evidencing a meeting of July 20th, 1990 exists"; No memoranda evidencing a July 20 or July 21 meeting—July 21, 1989 meeting

exists." See Transcript of hearing on Debtor's Motion to Compel Answer to Interrogatory; and Debtor's Motion to Compel Production and for sanctions, at 19–32 (Aug. 8, 1991). After a recent review of the transcript of the August 8, 1991 hearing, we find Fleet's responses to be untruthful and obstructionist, and that its failure to provide documents in its possession was completely unjustified.

Tellier's attorney submitted two schedules of time and costs associated with these discovery disputes, totalling $19,310.54. We find the rate of $150 per hour reasonable, as well as the hours spent by Mr. Prescott in *unnecessary* pre-trial combat with Fleet.

Accordingly, Fleet and its counsel are jointly and severally ordered to pay Tellier $19,310 as sanctions for its intentional abuses of the discovery process, and for the time and expense required to enforce compliance with requests and orders. We leave the apportionment of said payment up to Fleet and its counsel, since only they are privy to and aware of the reasons for the behavior which is the basis for this Order.

## V. CONCLUSION

For all of the foregoing reasons, it is ORDERED that:

1. The requests for relief in Tellier's second amended complaint are DENIED;

2. Fleet's motion for relief from the automatic stay is GRANTED in part as set forth in Part IV, *supra;* and

3. Tellier's motion for imposition of discovery related sanctions is GRANTED, in the amount of $19,310.

Enter Judgment consistent with this opinion.