FLEET NATIONAL BANK

v.

**Leo H. TELLIER.**

**Civ. A. No. 93–204B.**

United States District Court,
D. Rhode Island.

June 15, 1994.

George M. Prescott, Lincoln, RI, for plaintiff.

Richard L. Gemma, Robert D. Wieck, MacAdams & Wieck, Inc., Providence, RI, for defendant.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

This is an appeal from the United States Bankruptcy Court for the District of Rhode Island. In December 1990, Leo H. Tellier, Debtor/Plaintiff/Appellee, commenced an adversary proceeding in the Bankruptcy Court to enjoin Fleet National Bank, Defendant/Appellant, from foreclosing its mortgage covering an apartment complex Mr. Tellier had owned, but which he did not then own, since he had sold it five (5) months previously. The complex was located on Manville Hill Road in Cumberland (the "Manville Hill Road Property"). For fourteen (14) days during the months of January, February, March and April of 1992, the Bankruptcy Court conducted a trial on this and three related matters: Fleet National Bank's Motion for Relief From The Automatic Stay; Leo Tellier's Second Amended Complaint asserting lender liability causes of action against Fleet for compensatory and punitive damages; and Tellier's motion for discovery sanctions against Fleet. At the trial's conclusion, the Bankruptcy Court issued a twenty-three (23) page Decision and Order dated October 27, 1992 ("Decision"), 146 B.R. 598. The Bankruptcy Court ruled in favor of Fleet on the motion for relief from the automatic stay and lender liability issues, and ruled in favor of Tellier on the issue of sanctions.

Fleet and its counsel appealed the October 27, 1992 Decision and Order, by filing their Notices of Appeal on December 15, 1992 and January 7, 1993, respectively. Mr. Tellier has taken a Cross–Appeal of the Decision.

### Facts

The Bankruptcy Judge described the circumstance as follows. Leo Tellier was a real estate developer and speculator. In March 1984, Fleet granted Mr. Tellier an installment loan which was secured by a mortgage on a multi-unit apartment building located on Manville Hill Road in Cumberland, Rhode Island.

On November 21, 1986 Tellier established a so called "Westminster Account" with Fleet, and two weeks later deposited $381,-788.06 into the account. Pursuant to the terms of the Westminster Account agreement, Fleet obligated itself to, and did purchase registered securities with these funds on Tellier's behalf. Also, under the Westminster Account agreement, Tellier had access to various other credit and borrowing facilities, and on December 24, 1986, his line of credit was increased from $50,000 to $150,-000.

During the next two years, Fleet agreed to finance several real estate transactions for Tellier in Rhode Island and Massachusetts, amounting to over $600,000. Among these transactions was a $250,000 loan secured by an equity mortgage on the Manville Hill Road property, plus a pledge of all assets in the Westminster Account.

In the late 1980's, with things worsening economically for Tellier, it became necessary to use the proceeds of many of these loans to bring his lines of credit to within fifty (50%) percent of the value of his assets. On May 23, 1989, Tellier met with Fleet officials Mariana Sequeira, Robert Esau, Nancy Davis and Peter Hunt to discuss and resolve a $70,000 over-extension on Tellier's asset-based Westminster Account line of credit. As a result of the meeting, Fleet agreed to permit a temporary $100,000 over-line in reliance on Tellier's representations that the sale of two of his properties, including the Manville Hill Road property, was imminent, and that the proceeds of the sales would be used to cure the over-line.

On July 21, 1989, Tellier again met with Sequeira and Esau. By that time, Tellier owed approximately $653,000 in commercial loans to Fleet. Tellier's asset-based and home equity line of credit had outstanding balances of $232,000 and $100,000 respectively, and the market value of his Westminster Account assets was $325,000. At this meeting, Tellier, expecting that he would net approximately $90,000 after payment of the Westminster Account loans, requested that his Westminster Account assets be liquidated. Tellier also agreed that Fleet could reserve $54,000 of the proceeds in a money market account. It was estimated that the $54,000 would be sufficient to handle the debt service on his remaining commercial loan obligations for approximately six (6) months. In January, 1990, the balance in the money market account was down to $26,000, Tellier's total indebtedness to Fleet was $740,000, and income from the properties collateralizing Fleet's loans was producing an annual loss of $125,000.

On February 28, 1990, Tellier entered into a purchase and sale agreement with Joseph and Aurora Almeida for the Manville Hill Road property in the amount of $1,550,000, with a financing contingency of $1,162,500, and he so advised Fleet. On July 2, 1990, however, *without informing Fleet*, Tellier sold the Manville Hill Road property to the Almeidas, taking back a wrap-around mortgage. The Almeida mortgage was intended to pay Tellier for his equity interest and to assure payment to Fleet of its mortgage; Fleet then had no knowledge of the transaction. At a status meeting on July 20, 1990, in response to a direct question, Tellier falsely reported to Fleet that he had not yet sold the Manville Hill Road property. Also, updated cash flow reports, although promised, were not forthcoming. In September, 1990, during the performance of a routine title search, Fleet discovered that Tellier in fact had sold the Manville Hill Road property to the Almeidas. When confronted, Tellier essentially told Ann Gallagher that this transfer was really of no concern to her, and that as long as Fleet was receiving current payments on its mortgage, she should not be concerned about the sale. This event obviously triggered the beginning of the end of Fleet's willingness to be patient with Mr. Tellier.

The $250,000 note secured by the Manville Hill Road property provides that an event of default would occur, permitting Fleet to accelerate the indebtedness, upon the occurrence of several events including the "acquisition at any time or from time to time of (legal or equitable) title to the whole or any part of the property which is security for this note by any person, partnership or corporation other than Leo H. Tellier, Jr." The mortgage also provided that if all or any part of the property was transferred by the borrower without the lender's prior written consent, the lender could then, at its option, require immediate payment in full of all sums then due.

On October 1, 1990, one of Tellier's loans in the amount of $60,000 dated September 2, 1987 matured, and the entire principal balance together with accrued interest was due and payable. Tellier did not tender the outstanding balance due on the note on or before its maturity date, or at any time thereafter.

As a result of the various defaults under its loans including the default provisions contained in the loan documents, Fleet accelerated all of Tellier's indebtedness, and notified him by letter dated October 10, 1990.

On or about October 12, 1990, Tellier, through his attorney, George Prescott, Esq., tendered the unpaid principal balance due under the $60,000 note, but on the condition that Fleet "deaccelerate" all of the other obligations of Tellier to Fleet. On October 18, 1990, Fleet rejected Tellier's request that it not accelerate the debt.

In late October 1990, Tellier met with Ann Gallagher and Dan Williams of Fleet to discuss impending foreclosure sales. The meeting took place shortly before Tellier was to leave on an extended vacation. During this meeting, Tellier never specifically requested that Fleet cancel the foreclosure notices which were scheduled to appear in the newspapers, nor did Fleet commit to cancel or continue those advertisements. Fleet, through Dan Williams, did agree to "work with Tellier in an effort to resolve these

problems" and in that regard requested updated financial statements, tax returns and updated cash flow statements.

On or about November 13, 1990, while Tellier was away on vacation, foreclosure notices appeared in the Providence Journal and Woonsocket Call, advertising scheduled mortgagee's sales of the various properties securing Tellier's loans with Fleet. It was only through these foreclosure notices that the Almeidas became aware that Fleet was foreclosing the mortgage on *their* property. Immediately upon learning of Fleet's intentions, the Almeidas initiated their own discussions with Fleet regarding financing of the Manville Hill Road property.

When he returned from his vacation Tellier met again with Ann Gallagher and Dan Williams, and expressed surprise and anger that foreclosure notices had appeared in the newspapers. During the ensuing period while both Tellier and the Almeidas were discussing the Manville Hill Road problem with Fleet, Tellier refused to participate in any joint meeting involving the Almeidas.

Fleet had continued discussions with the Almeidas to provide financing in the amount of $1,000,000, provided the loan be secured by a first mortgage on the Manville Hill Road property. Those discussions were unsuccessful.

During the latter part of November 1990, Tellier and Ann Gallagher had discussions regarding a possible forbearance agreement of the pending foreclosure sales. Gallagher delivered a letter to Tellier on or about November 21, 1990 outlining the terms of a proposed forbearance agreement which would be acceptable to Fleet. This proposal never came to fruition either. Nevertheless, in order to keep alive the possibility of the Almeidas' refinancing, the Tellier foreclosure sales were adjourned from December 5, 1990 until December 12, 1990, and again until December 19, 1990.

On December 14, 1990, before the parties could meet as scheduled, Tellier filed his voluntary Chapter 11 petition, and on the same date he filed a Complaint seeking to permanently enjoin the foreclosure of the Manville Hill Road property. On the same date, Tellier filed a Motion for a Temporary Restraining Order seeking an immediate injunction against the foreclosure of the Manville Hill Road property. On December 18, 1990 the Bankruptcy Court granted Tellier's motion for a Temporary Restraining Order and scheduled a hearing on Preliminary Injunction for December 27, 1990. At the same time, the Manville Hill Road foreclosure sale scheduled for December 19, 1990 was adjourned until January 3, 1991.

At the hearing on Preliminary Injunction held on December 27, 1990, the parties agreed to adjourn the Manville Hill Road sale until January 15, 1991, with the expectation that during the adjournment the Almeidas would complete their refinancing with Fleet. On December 31, 1990, Fleet issued its commitment letter, which was accepted by the Almeidas on January 4, 1991.

On January 4, 1991, Fleet and the Almeidas completed the Manville Hill Road sale, paying off certain Tellier notes and placing excess proceeds of approximately $190,000 in escrow pending a hearing on Fleet's Motion for Adequate Protection. After hearing on January 15, 1991 and January 23, 1991, the Bankruptcy Court conditioned Mr. Tellier's use of the $190,000 upon payment of $45,000 to Fleet for application to two outstanding notes, and that all post-petition arrearages be cured.

The adversary proceeding leading to this appeal was originally commenced by Tellier solely to enjoin Fleet from foreclosing its mortgage on the Manville Hill Road property. Tellier has amended his complaint twice to include claims for breach of fiduciary duty and praying for compensatory and punitive damages.

### Sanctions

In his adversary proceeding commenced in the Bankruptcy Court, plaintiff, Tellier, filed two motions for discovery sanctions against defendant, Fleet. The first motion, Plaintiff's Motion for the Imposition of Sanctions and to Compel Production ("June 24 Motion"), was filed by Tellier on June 24, 1991. The second motion, Debtor/Plaintiff's Motion to Compel Answer to Interrogatory ("July 2 Motion") was filed by Tellier on July 2, 1991.

In the June 24 Motion, Tellier, pursuant to Fed.R.Civ.P. 37(d), requested that the Bankruptcy Court impose sanctions upon Fleet for its failure to timely produce two memoranda responsive to certain Requests for Production of Documents propounded by plaintiff. In the July 2 Motion, pursuant to Fed. R.Civ.P. 37(a), Tellier requested that Fleet be compelled to answer an interrogatory ("Interrogatory 16") that requested information about a loan made by Fleet to the Almeidas, who were other customers of Fleet. In the July 2 Motion, Tellier further moved under Fed.R.Civ.P. 37(a)(4) for his expenses in filing the Motion to Compel an Answer to Interrogatory 16.

Both the June 24 Motion and the July 2 Motion were heard by the Bankruptcy Judge on August 8, 1991 ("sanctions hearing"). At the conclusion of the sanctions hearing, the Bankruptcy Court found that discovery sanctions were appropriate for the belated production of the two memos, but reserved decision as to the "amount" of the sanctions to be imposed. The Bankruptcy Court also granted Tellier's Motion to Compel an Answer to Interrogatory 16.

There is some confusion in the record. The Court stated at the hearing that he was not about to find Fleet's lack of production of two memoranda willful, and further told Fleet's counsel, "-I've already told you I'm not about to find, so calm down a little." Earlier the Court had stated, "I am not going to make a finding that there was any willful, fraudulent concealment-of documents here." After the full trial, the Bankruptcy Court rendered its Decision and Order dated October 27, 1992. In that Decision, the Bankruptcy Court granted Tellier's motion for imposition of discovery related sanctions in the amount of $19,310, which the Bankruptcy Court ordered Fleet and its counsel jointly and severally to pay Tellier.

The heart of the issue regarding sanctions is the belated production of two memoranda evidencing two meetings between Tellier and Fleet on July 21, 1989 and July 20, 1990. In response to several document requests and interrogatories, Fleet advised Tellier that the memoranda did not exist. Both memos were later found and voluntarily and without further prodding produced.

With respect to the July 21, 1989 memorandum, Ann Gallagher, a Fleet employee, testified at the sanctions hearing that she had custody and control of all of the files which were related to Tellier's loan accounts with Fleet. She requested and received those files from Mariana Sequeira, another Fleet employee. (Sanction Hearing Transcript, p. 39–40, 50) Ms. Gallagher further testified that in complying with the various document requests made by Tellier, she personally searched those files, used a copy of Tellier's document request as a guide in searching those files, reviewed the responsive documents with her counsel, and delivered all of the documents which she found to be responsive to the document request to her counsel, who ultimately provided them to Tellier. (*Id.* at 60–61) Ms. Gallagher testified that she had not initially located the credit memorandum from the July 1989 meeting because that memorandum was chronologically misfiled in that portion of the Tellier file which pre-dated the document request. Ms. Gallagher ultimately found the July 1989 credit memorandum when she was searching back in the file for an appraisal, and as soon as she found the memorandum she provided it to her counsel, who in turn provided it to Tellier. (*Id.* at 52–54)

With respect to the handwritten memorandum from the meeting of July 20, 1990, Ms. Gallagher testified that the file in which that memorandum was contained was not originally provided to her. That file was maintained by Mariana Sequeira in her desk, and was not delivered to Ms. Gallagher when the files relating to the Tellier loan accounts were delivered to her from Ms. Sequeira. The so-called memo was described as "-some chicken scratch on a piece of yellow paper-". (pp. 39–42, 50) At the sanctions hearing the testimony of Mariana Sequeira was offered in the form of an offer of proof, to which Mr. Tellier's counsel stipulated. Ms Sequeira stated that she had forgotten about the existence of a personal file that she kept in her credenza which contained some handwritten notes. As soon as she discovered the file, she stated, it was produced. (*Id.* at 62)

There is nothing in the record to suggest that the failure to produce was other than the result of a careless mistake or even that the failure substantially affected a determination of the merits of the pending claims.

In contrast, the Bankruptcy Judge found the failure to produce these documents to be untruthful, obstructionist, and unjustified. Tellier's attorney submitted two schedules of time and costs associated with these discovery disputes, totalling $19,310.54. The billing rate was $150 per hour. The sanctions awarded to Tellier by the Bankruptcy Court break down as follows:

(a) fees, expenses and costs incurred by Tellier's counsel in preparing and arguing the motion for sanctions—$8,775.00;

(b) fees incurred in connection with taking the deposition of Robert Esau (7 hours)—$1,050.00, with expenses of $110.65;

(c) fees and expenses incurred in connection with taking the deposition of Nancy Davis (8.75 hours)—$1,312.50, with expenses of $564.85;

(d) fees and expenses incurred in connection with taking the initial deposition of Mariana Sequeira (7.6 hours)—$1,140.00, with expenses of $250.25;

(e) fees and expenses incurred in retaking the deposition of Mariana Sequeira (3.5 hours)—$525.00, with expenses of $240.25; and

(f) fees and expenses incurred in conducting other discovery in the case—$4,503.94.

A charge of $8,755.00 for preparation is obviously unreasonable, if not irresponsible. At $150.00 per hour this amounts to 51 hours of charged time. Depositions which continue interminably are unnecessary for counsel who are prepared. 7 hour, 8.75 hour and 7.6 hour depositions of fact witnesses who testify from records is not supportable. Indeed, even the repeat deposition of 3.5 hours continued far beyond that necessary to explain some recently discovered document.

In sum, it appears that the Bankruptcy Court has directed Fleet and its counsel to pay Mr. Tellier, as a sanction, the entire and unreasonable cost of discovery which he incurred in this case.

■ In general, a trial court should consider the purpose to be achieved by a given sanction and then craft a sanction adequate to serve that purpose. *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir.1990). "While we eschew the imposition of rigid guidelines for the trial courts in this circumstance-specific area of the law, the judge should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms. Whether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime." *Id.*

■ The only expenses Tellier's counsel can conceivably relate to the subsequent discovery of the two memoranda in question are those incurred in the retaking of Mariana Sequeira's second deposition. Presumably, this was to afford an opportunity to clarify any questions on the later produced memoranda. With respect to the initial deposition of Mariana Sequeira, counsel must surely have been able to extract some useful information, otherwise this Court must conclude that Ms. Sequeira was questioned repeatedly for 7.5 hours about a memo, the existence of which she did not recall, all to no avail. Further, the depositions of Nancy Davis and Robert Esau were obviously not affected by the belated production of the memoranda, since counsel has found it unnecessary to retake their depositions after the memoranda surfaced. In short, it appears that none of the expenses listed above and awarded by the Bankruptcy Court, with the exception of the retaking of Mariana Sequeira's deposition, are in fact related to the actual tardy surfacing of the documents.

The sanctions imposed by the Bankruptcy Court authorize an award to Mr. Tellier of in excess of $19,000. This is about 25 times the amount Tellier claims it cost to retake Ms. Sequeira's deposition. Whether deterrence or compensation is the goal of the imposed sanction, awarding $19,310.54 for the cost of the entirety of the discovery conducted by Plaintiff/Debtor/Appellee is too severe. In the eloquent, picturesque language of the appellate court, such an excess of economic force attempts to slay a mouse with an elephant gun. The sanction here should bear a

more direct relation to the actual harm suffered—the necessitated retaking of one Fleet employee's deposition.

The defendant should not have to bear the cost of all of the plaintiff's discovery. A figure more closely tied to the harm actually suffered if at all justified should be imposed. But, there was no basis at all for a sanction.

In *R.W. International Corp. v. Welch Foods, Inc.*, 937 F.2d 11 (1st Cir.1991), the Court of Appeals dealt with the issue of sanctions with respect to document production. "In fine, Rule 37 sets forth a clear path to be followed if a party believes that another litigant is not cooperating in the discovery process." *Id.* at 18. When a party failed to produce documents not specifically called for in a discovery request, the opposing party should file a motion to compel their production. *Id.* That motion would have provided the court with the opportunity to clarify whether the documents were actually encompassed by the discovery request. *Id.* The court would then enter an order requiring production of the documents. *Id.* "If thereafter, the [party] had refused to comply with the specific order for production, sanctions could appropriately have been imposed under Rule 37(b)(2)." *Id.*

In this instance, Mr. Tellier's June 24 Motion requested that the court impose sanctions for the delayed production of the two memoranda. Sanctions, however, could not have been appropriately imposed under Rule 37(b)(2) since no prior specific order for production was in place, and therefore it was impossible to find that defendants had refused to comply. *See R.W. Intern. Corp. v. Welch Foods, Inc.*, at 19.

Further, any reliance upon Fed.R.Civ.P. 37(d) to impose sanctions for the belated production of the two memoranda in question is misplaced. That provision includes failure to appear for a deposition, failure to answer interrogatories, or failure to serve a written response to a request for inspection, Fed. R.Civ.P. 37(d), none of which is present here. "[T]he power to impose sanctions for failure to produce all the documents requested or to respond fully to the interrogatories cannot be found in Rule 37(d), F.R.Civ.P., if answers or objections have been filed to the interrogatories or if a written response has been filed to a request for production of documents." *Petroleum Inc. Agency v. Hartford Acc. & Indem. Co.*, 106 F.R.D. 59 (D.Mass.1988). In this instance, the plaintiff does not allege that Fleet totally failed to respond to any of its document requests and interrogatories. In fact, with respect to the two memoranda in question, the plaintiff asserts that Fleet did make responses that they did not exist. Thus, as "answers", "objections" or "written responses" have been made, sanctions under Rule 37(d) are inappropriate.

Next, this Court will address Mr. Tellier's July 2 Motion to Compel an Answer To Interrogatory 16, also granted by the Bankruptcy Court at the August 8, 1991 sanctions hearing. By Order of November 16, 1991, the Bankruptcy Court allowed Fleet twenty (20) days to serve an answer to that interrogatory to Mr. Tellier, which Fleet met. A court order granting a motion to compel, which a party fully complies with, cannot be the basis for an award of sanctions. *See R.W. Intern. Corp. v. Welch Foods, Inc.*, at 19. At most, the Bankruptcy Court had the power, should it have found the failure to make production of the non-located documents to be substantially unjustified, to award reasonable expenses, including attorneys' fees to the movant incurred in obtaining the order compelling production. *See R.W. Intern. Corp. v. Welch Foods, Inc.*, at 19; Fed.R.Civ.P. 37(a)(4). As stated above, there is certainly no justification for expenses and costs in the $8,775 amount requested by Mr. Tellier's counsel for arguing the motion.

Finally, there is the issue of the motion to compel production made by plaintiff to inspect original files pertaining to Mr. Tellier's Westminster Account. This motion was made concurrently with the motion for sanctions. That motion was granted at the sanctions hearing without objection or argument. In fact, the entire issue occupied approximately 6 lines of the transcript. (Sanction Hearing Transcript 81–82). Again, the Bankruptcy Court had the power, should it have found the failure to make production of the non-located documents to be substantially unjustified, to award reasonable expenses,

including attorneys' fees to the movant incurred in obtaining the order compelling production. *See R.W. Intern. Corp. v. Welch Foods, Inc.,* at 19; Fed.R.Civ.P. 37(a)(4). However, as no time was spent on arguing this issue and no objection was offered by Fleet, it could not be the basis for any award of attorney' fees and expenses.

### Cross Appeal

 Mr. Tellier cross-appeals from the Decision and Order of the Bankruptcy Court denying the relief he sought against Fleet. Specifically, Mr. Tellier appeals to this Court the following findings by the Bankruptcy Court:

(a) Fleet National Bank is not a fiduciary of Tellier;

(b) Tellier's sale of the Manville Hill Road Property to the Almeidas constituted a default under the loan documents; and

(c) Fleet's continuation of the foreclosure sale of the Manville Hill Road property after the filing of Tellier's bankruptcy petition was not a violation of the automatic stay provision 11 U.S.C. § 362.

However, Mr. Tellier has not provided to this Court a transcript of the underlying proceedings in the Bankruptcy Court in support of his cross-appeal. As a result, this Court does not have before it an adequate record of the findings of fact upon which the Bankruptcy Court based its decision.

Bankruptcy Rule 8013 provides that "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of witnesses." 11 U.S.C. *Bankruptcy Rules and Forms,* Rule 8013. A reviewing court can reverse under the "clearly erroneous" standard if, on the entire evidence "[the court] is left with the definite and firm conviction that a mistake has been committed". *In re Perimeter Park Investment Associates, Ltd.,* 616 F.2d 150, 157 (5th Cir.1980). Here, such a conviction cannot be reached since the record is incomplete.

In reviewing the Bankruptcy Court's decision, the District Court should have before it "all documents necessary to afford a full understanding of the case." *In re Neshaminy Office Building Associates,* 62 B.R. 798 (E.D.Pa.1986), citing *In re W.T. Grant Co.,* 432 F.Supp. 105 (S.D.N.Y.1977); *See also In re T. Michaelis Corvette Supplies, Inc.,* 14 B.R. 365, 367 (Bkrtcy.N.D.Ohio 1981). Where an appellant failed to provide a record on appeal which gave a "cogent demonstration by the appellant of error committed below", a Bankruptcy Appellate Panel for the First Circuit would not disturb the order of the Bankruptcy Judge. *See In re John J. Slavin Contracting, Inc.,* 29 B.R. 444, 445–46 (Bankr.App.Panel, 1st Cir.1983).

In this instance, the total absence of a transcript on appeal inhibits the ability of this Court to review the Bankruptcy Court decision. The failure of the cross-appellant, Tellier, to provide a cogent demonstration of error committed by the Bankruptcy Court necessitates that this Court refuse to disturb that court's decision.

### Conclusion

In sum, Fleet's appeal is sustained and the action is remanded to the Bankruptcy Court for entry of judgment for Fleet in light of this Court's observations. The debtor's cross-appeal is dismissed.