**In re Lawrence G. WILLIAMS, Debtor.**

**Lawrence G. WILLIAMS**

**v.**

**UNITED STATES of America.**

No. CA 96–006ML.

United States District Court,
D. Rhode Island.

Nov. 5, 1997.

Andrew S. Richardson, Boyajian, Harrington & Richardson, Providence, RI, Gerard Riso, Stein, Haspel, Riso & Jacobs, New York City, for Plaintiff.

Robert B. Mann, Mann & Mitchell, Providence, RI, Thomas J. Clark, U.S. Dept. of Justice, Tax Division, Washington, DC, for William L. Bragg and Charles J. Cannon.

Carter G. Phillips, Sidley & Austin, D. Patrick Mullarkey, Deborah S. Meland, Thomas J. Clark, U.S. Dept. of Justice, Tax Division, Washington, DC, for U.S.

## MEMORANDUM OPINION

LISI, District Judge.

This is an appeal of sanctions imposed on two government attorneys, Charles J. Cannon and William L. Blagg, by the United States Bankruptcy Court for the District of Rhode Island. In addition to levying a $750 monetary discovery sanction against each, the bankruptcy court published factual findings pertaining to the conduct of the two attorneys during the discovery process. Additionally, the bankruptcy court enjoined both from seeking reimbursement from their employer, the United States. On reconsideration, the bankruptcy court vacated the monetary sanction as to appellant Blagg, but affirmed the sanction against appellant Cannon, and refused to withdraw its adverse findings of fact. Both attorneys now appeal the bankruptcy court's judgment on due process grounds. They are accompanied in their appeals by the United States, the Attorney General, and the Secretary of the

Treasury (hereafter collectively referred to as the government appellants), who separately argue that the nonreimbursement order violates the separation of powers. This court has taken jurisdiction pursuant to 28 U.S.C. § 158(a)(3).

## I. OVERVIEW AND PROCEDURAL HISTORY

Despite a complicated veneer, this case is not quite so mystifying as might first appear. It is the product of a set of inartfully drawn discovery requests, a series of broken promises, a pair of bruised egos, and the understandable frustration of a bankruptcy judge whose patience over the course of already protracted proceedings was exhaustively tested. It is now the duty of this court to set the record straight.

### A. Background

In 1991, Lawrence G. Williams, a debtor in bankruptcy, filed an adversary proceeding seeking a determination of his federal tax liability for the tax years 1978 through 1988 and 1990. Initially, the Internal Revenue Service (IRS) claimed a deficiency of nearly $6.6 million, including delinquent taxes, penalties, and interest. This figure was based, in significant part, on the disallowance of substantial deductions taken from losses in various partnerships in which the debtor invested. Of central importance in the adversary proceeding, now pending, are the validity of these deductions.

Apparently, Williams was one of thousands of limited partners in a group of fifteen tax shelters known as the Arbitrage Management Partnerships (AMPs). Through the acquisition of straddle positions in repurchase agreements and U.S. Treasury bill options, the AMPs aimed to pass substantial losses on to their investors. In time, however, the AMPs failed, and the Internal Revenue Service (IRS) sought to audit the AMPs and their respective general and limited partnership interests. However, because the

streamlined auditing procedures pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. 97–248, § 402(a), 96 Stat. 648, codified at 26 U.S.C. §§ 6221–31, were unavailable for the tax years preceding TEFRA's effective date, the United States Tax Court supervised an initiative to resolve all of the related tax deficiencies on a consolidated basis (hereafter, the tax court proceedings).[1]

In 1987, the tax court assigned a team of three negotiators to represent the various interests concerned in the hope that they could select one or more test cases for litigation and/or negotiating a settlement. Of some significance, appellant Blagg represented the IRS in those proceedings, and Dennis L. Stein, the debtor's counsel, represented one of the general partner's interests.[2]

Early in 1988, the negotiators informed the tax court that a tentative settlement had been reached. On February 7, 1989, the IRS wrote to the debtor advising him of the settlement offer and outlined the procedures by which he could accept it. The debtor has put in issue in the underlying adversary proceeding whether or not he accepted the government's offer to settle any tax liability arising out of his investments in the AMPs. From his point of view, this issue is of considerable importance, for if he effectively accepted an offer of settlement, he asserts that his potential exposure may be greatly reduced or eliminated by virtue of the applicable statute of limitations.

On or about April 30, 1991, the debtor served a request for the production of documents pursuant to Bankruptcy Rule 7034 and Rule 34 of the Federal Rules of Civil Procedure. Specifically, he sought four broad categories of documents:

 1. Documents relating to all extensions of statute of limitations for both Lawrence G. Williams individually and for any partnership in which Lawrence G. Williams was a general or limited partner for the tax years 1978 to the present;

---

1. The TEFRA procedures enable the IRS to audit partnerships, such as the AMPs, and enter into settlements with their constituent partners without necessitating an audit of each partner individually.

2. The parties "stipulated" that through the course of the AMPs litigation, Stein and Blagg had developed an "acrimonious" relationship.

2. All tax returns filed with the Internal Revenue Service by Lawrence G. Williams from 1978 to the present;

3. All workpapers developed or used in connection with any audits of tax returns filed by Lawrence G. Williams from 1978 to the present; and

4. All internal correspondence and other internal documents regarding tax returns filed with the Internal Revenue Service by Lawrence G. Williams from 1978 to the present.

The government did not timely serve its response to these requests.

Exactly five days after the government's response was due, that is to say, on June 7, 1991, the debtor moved to compel production of documents pursuant to Fed.R.Civ.P. 37(a).[3] On June 18, 1991, the government served objections to the debtor's requests on the basis that they were overbroad, burdensome, and sought privileged material. Thereafter, the government filed a timely objection to the debtor's Rule 37(a) motion, the substance of which was that it served a response to the debtor's requests, which, albeit untimely, mooted the Rule 37(a) issue.

The bankruptcy court held two hearings on the debtor's motion to compel. The first was in 1991. A docket entry that July notes, "IRS needs more time to produce information." A second hearing was held the following January, 1992. There, the bankruptcy court considered the government's specific objections on their merits and overruled them. By order dated January 14, 1992, the bankruptcy court ordered that "the govern-

ment produce all of the requested documents within forty–five days...." This deadline was to expire on February 28, 1992.

On February 25, 1992, within the period prescribed by the court, the government sent the debtor a collection of documents. Delivered under two separate covers, the government stated its belief that "this ... completes the production of documents as ordered by the court." Not included in this response, however, were certain consents to extend the statute of limitations executed by either the debtor or by the various partnerships in which he had invested (hereafter, "the consents"), or documents concerning audits of these partnerships (hereafter, "the partnership audit files"). The debtor complained about the government's failure to produce these documents for the first time in a motion for partial summary judgment filed in April, 1992.

In his motion, the debtor argued that for each year that the government did not produce a consent, it was time-barred from seeking a deficiency. He also argued that because the government had not produced the partnership audit files, it could not prove any tax deficiency in connection with his partnership investments. The government responded that it had, in fact, produced most of the requested consents.[4] With respect to the partnership audit files, the government disputed that it failed to produce requested documents. However, it did argue, to the extent these files were not produced, that summary judgment was an inappropriate

3. Appellants suggest that the debtor violated a local rule requiring counsel to confer before seeking judicial intervention to resolve discovery disputes. Presumably, appellants are referring to Local Rule 13(d) which requires counsel to attempt to settle objections to discovery by agreement. See D.R.I Loc. R. 13(d). Of course, at that point in time, the government had not served any objections to the debtor's requests. However, to the extent that the debtor jumped the gun in moving to compel, see Fed.R.Civ.P. 37(a)(2)(A) (requiring certification that "movant has in good faith ... attempted to confer with party not making disclosure in an effort to secure disclosure without court action"), the government did not raise any procedural deficiency to the bankruptcy court, and this court deems the issue waived.

4. The record is somewhat unclear on whether or not all of the requested consents were made part of the government's February 25, 1992 shipment of documents. Attached as exhibits to the government's response to Williams' motion for summary judgment, served April 29, 1992, was a set of consents (IRS Form 872–A) for the tax years 1978, 1979, 1980, 1981, 1982, 1985, 1986, and 1987. Moreover, the government submitted copies of executed powers of attorney (IRS Form 2848) for each of the tax years 1978 through 1987. Although the nonproduction of any of these materials could have formed the basis for sanctions by the bankruptcy court, it is clear that the partnership audit files were the basis for the court's decision, and this court limits its review to the issues relating to these items.

remedy. It suggested that the debtor could more properly find a remedy for nonproduction in a motion for preclusion. The bankruptcy court denied the debtor's motion on May 8, 1992.

On May 20, 1992, seemingly at the government's cue, the debtor filed a motion to preclude. This motion bore great similarity to the preceding summary judgment motion. In support thereof, attorney Stein filed an affidavit resembling a memorandum of law which stated that the government had not turned over the partnership audit files, which, "[p]resumably ... constitute the universe of documents responsive to [the April 30, 1991] request." Ex. 3 at 2. Accordingly, Stein opined that the government should be precluded from introducing any materials contained within these files because they were not produced in accordance with the bankruptcy court's January 14, 1992 order.

The government timely responded to this motion on June 12, 1992. It explained that the reason why it did not produce any of the documentary materials contained in the partnership audit files was because, with the exception of those documents pertaining to the extension of the applicable statute of limitations, the debtor had never requested any partnership–related materials. This response sparked a supplemental affidavit from Stein which, for the first time, raised questions of fact regarding certain representations or admissions by the government's counsel, who, at that time, was appellant Charles J. Cannon. Thereafter, at the joint request of the parties, the bankruptcy court granted a series of extensions and continuances during which time, as this court understands it, the parties endeavored to negotiate a settlement. These delays postponed a hearing on the preclusion issue for nearly two and one–half years, that is, until January, 1995.

### B. The January 1995 Hearing

In preparation for the hearing on preclusion, the parties filed a, so–called, joint "pre–trial" memorandum.[5] Signed by counsel for both parties, this pleading directed the bankruptcy court to the issues of fact in dispute. The government acknowledged that among the issues for the court to decide were:

> Whether the government acted with diligence in securing from the Internal Revenue Service the documents responsive to the Requests.... Whether the government was at fault in failing to produce in this proceeding the documents responsive to the requests and required to be produced pursuant to the January 4, 1992 [sic] Order.... Whether the government has acted in good faith in responding to the Order to produce documents.

Moreover, the parties directed the court to the ultimate issue of law,

> Whether the appropriate sanction to be imposed against the Government ... should be the striking of its pleadings, or some other sanction pursuant to Rule 37(b) of the Federal Rules of Civil Procedure and Rule 7037(b) of the Bankruptcy Rules.

The parties identified as potential witnesses appellants Cannon and Blagg as well as attorney Stein. Additionally, they listed a host of exhibits for use at the hearing, all pertaining to the issue of offer and acceptance and presumably contained in the contested partnership audit files.

At the outset of the hearing, the government suggested that the court entertain the merits of the offer and acceptance issue. The debtor vehemently objected to this suggestion as the contested discovery, counsel asserted, went to the essence of that issue. And while the bankruptcy court resolved to try only the discovery dispute, the parties did not focus on the operative date, February 28, 1992, but instead led the court on a wild frolic of what transpired in the two and one–half years between May, 1992 and January, 1995. As to these events, the bankruptcy court heard evidence of the following.

Shortly after receiving the debtor's motion to preclude, Cannon contacted Blagg to ask for his assistance in locating all of the partnership audit files. Blagg, a staff attorney

---

5. Of course, the bankruptcy court held a "hearing" on this matter rather than a "trial." To avoid confusion, the court continues to employ the imprecise term "trial" as it is the label affixed both by the parties and the court below.

with the IRS, had been assigned the debtor's case and was familiar with it as early as May, 1992. Blagg testified to the bankruptcy court that the purpose for his involvement in the case was to locate and respond to the debtor's document requests. Blagg had represented the IRS in the AMPs litigation and had an extensive knowledge of the whereabouts and contents of the various partnership audit files.

In June, 1992, Cannon and Blagg met to discuss the substance of the debtor's requests. Thereafter, on or about June 30, 1992, Cannon met with Stein to discuss disclosure of these materials. Although Cannon told Stein that he had not yet made any effort to secure the partnership audit files from the IRS, he informally promised "anything he had [Stein] could see." By that time, Cannon was fully aware of what Stein was seeking or, at least, believed he had requested, that is, all partnership–related materials bearing on a settlement of the government's claim and materials germane to the calculation of the debtor's tax deficiency. The bankruptcy court heard undisputed evidence that Cannon renewed this promise on several occasions, each time reassuring Stein that he would produce all nonprivileged documents in the government's possession. Apparently, Stein took Cannon at his word and did not press the pending motion to preclude the introduction of this evidence.

A month later, Stein received a letter from the Department of Justice, dated July 30, 1992, which confirmed that the government would make available all documents contained in the partnership audit files. The letter described "thousands of pages" occupying "10 linear feet of lateral file space" that Stein would be permitted to review at the IRS District Counsel's office in New York City. The letter also stated that Stein's photocopying needs would be accommodated so long as they would not interfere with the IRS's normal operations. Stein was instructed to make arrangements with Cannon. Cannon, in turn, referred Stein to Blagg.

Over the course of the next several months, Stein attempted to contact Blagg to arrange an opportunity to view the elusive partnership audit files, but Blagg did not return his calls. The bankruptcy court heard evidence that Stein left a message for Blagg "every day or second day," amounting to over one hundred messages in all. Once Stein succeeded in contacting Blagg, it quickly became apparent that Blagg had a different understanding of which documents Stein would be permitted to see than Cannon had led Stein to believe. Finally, on October 30, 1992, Stein requested in writing that Cannon make the necessary arrangements with Blagg.

On November 12, 1992, Stein was permitted to view the "ten linear feet." These papers were neither indexed nor Bates stamped, and not all of the files for all of the partnerships in which the debtor had invested were there. Blagg said that he was still locating certain files.

At the end of his inspection, Stein selected a small stack of documents which he asked be photocopied. Blagg said that he would ask his secretary to copy and send the documents in a short time. Stein did not receive these documents for some three months.

Following his trip to the District Counsel's office, Stein notified Cannon that the audit files for some of the debtor's investments were not among the files made available. In a letter dated November 30, 1992, Stein submitted to Cannon an "Items Missing" list, which set forth, in detail, eleven documents he was seeking and to which of the debtor's partnership investments each document pertained. Among the documents listed were documents generated in connection with the settlement of the AMPs. Stein called these documents "crucial." Cannon again called Blagg.

On January 13, 1993, Blagg wrote Cannon stating that he would need another four months to locate all of the missing items. With respect to the AMPs settlement negotiation documents, in particular, Blagg stated that he was unaware of any additional documents which would have been "relevant to this issue." In actuality, closer to a year passed before the "relevant" but "missing" documents were produced. Blagg did not describe to the bankruptcy court any serious effort on his part to obtain these items in a

timely fashion. Although the bankruptcy court did not endeavor to decide the government's motives for not producing the partnership settlement documents, it did find that Cannon and Blagg, both, had not produced documents as it had ordered on January 14, 1992.

### C. The Bankruptcy Court's Findings and Conclusions

By order dated April 14, 1995, the bankruptcy court found that the government "repeatedly and deliberately violated Rule 37(b)." *See Williams v. United States (In re Williams)*, 181 B.R. 1, 2 (Bankr.D.R.I.1995) (*"Williams I "*), *vacated and amended in part by* 188 B.R. 721 (Bankr.D.R.I.1995) (*"Williams II "*). In arriving at this conclusion, the bankruptcy court described the government's conduct, by and through its agents, Cannon and Blagg, as "egregious," "autocratic," "bureaucratic," "disdain[ful]," and overall, "intentional, unprofessional and unjustified." *Id.* at 2–5. Suffice to say, the bankruptcy court's first decision and order left little doubt as to its belief that both Cannon and Blagg had acted in bad faith and flouted its order compelling the production of documents. *See id.* Much of the court's venom was directed at appellant Blagg.

Although this court need not rehash the bankruptcy court's opinion in its entirety, among the more stinging of the court's assessments was that Blagg had done "his best ... to obstruct the Plaintiff's discovery." *Id.* at 4. This finding was anchored on Blagg's conceded failure to return Stein's phone calls and the three month delay in photocopying and mailing the documents selected in November, 1992. *See id.* at 3–4. With respect to the latter incident, the court found that Blagg had unprofessionally attempted to shift the blame upon his secretary, suggesting "Mr. Blagg should have ... rolled up his sleeves and made the copies himself...." *Id.* at 4. Moreover, the court expressed "irreconcilable difficulty" with Blagg's incomplete and unindexed production in November, 1992, and interpreted his January 13, 1993 letter to Cannon as a "unilateral extension of court imposed deadlines" and a usur-

pation of the court's authority to determine what is "relevant" in discovery. *Id.* at 5.

With regard to appellant Cannon, the court was hardly more charitable. Finding that he had "waited over one year to forward to the Plaintiff documents that were continuously in his possession," the court graded "his performance and credibility at about the same level as that of [Blagg] ... even though his manner may not be as abrasive." *Id.* Purportedly pursuant to Rule 37(b), the court sanctioned both lawyers $750 personally and enjoined them from seeking reimbursement from their employer, the United States. *See id.* at 5. Cannon, Blagg, and the government appellants all took exception to this order.

Immediately following the April 14, 1995 order, Cannon and Blagg, joined by the government appellants, moved that the bankruptcy court reconsider its decision. Blagg and Cannon each submitted affidavits setting forth additional facts which they believed were not brought to light at the January hearing. On reconsideration, the parties collectively argued that the bankruptcy court exceeded its authority, that Blagg and Cannon were denied fair notice and the opportunity to be heard, that the nonreimbursement injunction violated the separation of powers, and that many of the court's findings were factually erroneous. Prior to a hearing on this motion, the Justice Department requested that the court informally meet with Cannon, Blagg, and their attorneys to discuss, among other things, whether in light of Cannon's and Blagg's post–judgment declarations the court's view of their conduct remained the same. This request was summarily denied.

In due course, the bankruptcy court did reconsider its initial judgment. In a second published decision, the bankruptcy court explained the basis for its jurisdiction, the notice and the hearing provided, and its authority to sanction government lawyers personally. *See Williams II*, 188 B.R. at 727–31 (citing *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1370–71 (9th Cir.1980)). Additionally, it acknowledged and corrected certain factual errors, but specifically refused to take into account the attorneys' post–

judgment affidavits. *See id.* at 725–27. These, the court discredited as "meritless afterthoughts" and "after–the–fact reminiscences." *Id.* at 726.

Although the court expressed uncertainty whether Blagg was subject to the court's Rule 37 sanctioning powers, it decided to "err on the side of conservatism" because Blagg had not formally entered an appearance. *Id.* at 727. Accordingly, the court did vacate the monetary sanction it had imposed on Blagg for lack of personal jurisdiction over him. *See id.* Nevertheless, the court was unambiguous that despite "a very close call" on the jurisdictional question, it left its "findings and conclusions regarding Mr. Blagg's conduct and demeanor . . . intact." *Id.* at 728.

### D. Basis for Appeals

Now, Cannon and Blagg, accompanied by the government appellants, appeal the amended judgment of the bankruptcy court. Cannon argues that the $750 monetary sanction remaining against him constitutes a punitive, criminal fine beyond the authority of an Article I court to impose. Additionally, he argues that the bankruptcy court impermissibly sanctioned him pursuant to Rule 37(b)(2) for actions not in violation of any freestanding discovery order and, equally, that the basis for such sanctions is not supported by the record facts. Finally, Cannon asserts that he was deprived of due process because the bankruptcy court did not fairly apprise him in advance that sanctions might be imposed against him personally and that, in failing to consider his post–judgment declaration, it denied him any opportunity to be heard as to his personal culpability in this affair.

Blagg, no longer subject to any monetary sanction, appeals from the bankruptcy court's findings and conclusions. He asserts that the court's factual findings constitute a sanction in and of themselves. He, like Cannon, maintains that he was denied notice and an opportunity to be heard on the issue of his personal culpability. However, he further asserts that he appeared at the hearing merely as a witness and, thus, the court lacked personal jurisdiction over him, a non-party in the case. Among other relief requested, he petitions this court to issue mandamus to the bankruptcy judge to withdraw his published opinions.

Finally, the government appellants press their argument that the bankruptcy court unlawfully interfered with their constitutional grant of authority and discretion by purporting to enjoin their employees from seeking reimbursement for expenses incurred in the course of their official duties. The court sets aside for the moment the merits of this argument as it presents issues ancillary to the appeals of Cannon and Blagg.

## II. DISCUSSION

### A. Appellate Jurisdiction

■ Before embarking on any discussion of the merits of these appeals, it is incumbent on this court to establish that it may exercise jurisdiction over this matter. *See Petralia v. AT&T Global Information Solutions Co.,* 114 F.3d 352, 353–54 (1st Cir.1997). "Jurisdiction can never be assumed but must be premised on some affirmative source.'" *Doughty v. Underwriter's at Lloyd's, London (In re Wallis),* 6 F.3d 856, 860 (1st Cir.1993). Initially, this court expressed concerns that it was without authority to entertain this appeal at all. At the request of the court, appellants separately briefed and argued this court's jurisdiction, and, by order dated September 30, 1996, the court granted leave to appeal pursuant to 28 U.S.C. § 158(a)(3). It now states its reasons for doing so.

■ As an initial matter, the court observes that many courts have recognized that publicly reprimanding an attorney in a judicial opinion may operate as a sanction. *See, e.g., Bank of Nova Scotia v. United States,* 487 U.S. 250, 263, 108 S.Ct. 2369, 2378, 101 L.Ed.2d 228 (1988); *United States v. Hasting,* 461 U.S. 499, 506 n. 5, 103 S.Ct. 1974, 1979 n. 5, 76 L.Ed.2d 96 (1983); *In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 69 (2d Cir. 1996); *United States v. Horn,* 29 F.3d 754, 758 n. 1 (1st Cir.1994); *United States v. Isgro,* 974 F.2d 1091, 1099 (9th Cir.1992), *cert. denied,* 507 U.S. 985, 113 S.Ct. 1581, 123 L.Ed.2d 148 (1993). Although there is no constitutionally protected interest in one's

reputation, *see Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976), some courts have found that a published reprimand of an attorney confers standing in that attorney to appeal injurious findings of fact, see *Fromson v. Citiplate, Inc.,* 886 F.2d 1300, 1304 (Fed.Cir.1989), *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.,* 663 F.2d 371, 373 (2d Cir.1981). This court does not disagree that there is a point where judicial criticism turns to operate as a serious sanction and acknowledges that an overly harsh or unfounded published reprimand may warrant appellate review in some circumstances. *Cf. FDIC v. Tekfen Constr. and Installation Co.,* 847 F.2d 440, 444 (7th Cir.1988) ("a lawyer's reputation for integrity, thoroughness and competence is his or her bread and butter" and "[w]e may not impugn that reputation without carefully analyzing the legal and factual sufficiency of the arguments."). However, whether interlocutory appellate review should be made available is an entirely separate question.

■ There are generally two avenues to appeal an order of a bankruptcy court. *See Northeast Savs. F.A. v. Geremia (In re Kalian),* 191 B.R. 275, 277 (D.R.I.1996). First, an aggrieved party may appeal "from the final orders, judgments, and decrees" of a bankruptcy court as a matter of right pursuant to 28 U.S.C. § 158(a)(1). At the same time, a district court, in its discretion, may grant leave to appeal "other interlocutory orders and decrees" of a bankruptcy court.

28 U.S.C. § 158(a)(3). Unfortunately, there are no standards set out either in the statutes or the rules governing a district court's exercise of its discretionary power to grant leave to appeal an interlocutory order of a bankruptcy court. *See In re American Colonial Broad. Corp.,* 758 F.2d 794, 801 n. 7 (1st Cir.1985); *Northeast Savs.,* 191 B.R. at 277. However, the perimeters of a district court's appellate jurisdiction are generally informed by the same policy considerations as guide the courts of appeals in avoiding piecemeal litigation, promoting judicial efficiency, and eliminating delays caused by protracted interlocutory appeals.

■ In *Appeal of Licht & Semonoff,* 796 F.2d 564 (1st Cir.1986), the First Circuit decided that monetary discovery sanctions imposed on an attorney are generally nonfinal orders. *See id.* at 570. Because they can always be rescinded or compromised during the pendency of an action, the *Licht* court held that monetary discovery sanctions should not be immediately appealable until entry of judgment in the underlying case. *See id.* If all there were to this case was the monetary sanction, *Licht* would squarely counsel against interlocutory review. However, because the bankruptcy court's remarks threaten injury of a continuing nature, this court found that it must depart from *Licht* and exercise its discretion to entertain this appeal pursuant to 28 U.S.C. § 158(a)(3).[6]

---

6. Indeed, many district courts, including this one, have analogized the standards governing permissive appeals under § 158(a)(3) to the procedures for certification of interlocutory appeals pursuant to 28 U.S.C. § 1292(b). *See, e.g., Northeast Sav.,* 191 B.R. at 277; *In re Giguere,* 188 B.R. 486, 488 (D.R.I.1995); *In re Dino's, Inc.,* 183 B.R. 779, 781 (S.D.Ohio 1995); *In re IBI Security Serv., Inc.,* 174 B.R. 664, 669–71 (E.D.N.Y.1994). This analogy, albeit useful, is not perfect.

The procedures set forth in § 1292(b) are not similarly contained in § 158(a)(3). Utilization of the § 1292(b) certification process by district courts before hearing an appeal from a bankruptcy court is therefore jurisprudential and not jurisdictional. *See In re Huff,* 61 B.R. 678, 682 n. 6 (N.D.Ill.1986). After all, a bankruptcy court's power to "hear and determine cases under title 11" is originally derived from a reference by a district court. 28 U.S.C. § 157(b). This reference may be withdrawn by the refer-

ring district court "in whole or in part ... on its own motion. ....." 28 U.S.C. § 157(d). As the Third and Seventh Circuits have both recognized, it is doubtful that Congress intended to grant district courts plenary authority over bankruptcy cases generally, implicit in the authority to withdraw a reference *sua sponte,* while at the same time restricting district courts' authority over interlocutory appeals. *See Fruehauf Corp., v Jartran, Inc. (In re Jartran),* 886 F.2d 859, 866 (7th Cir.1989); *Bertoli v. D'Avella (In re Bertoli),* 812 F.2d 136, 139 (3d Cir.1987). Thus, while strict adherence to the § 1292(b) procedures comports with sound policy, the language of § 158(a)(3) obviously vests broader discretion in the district courts to permit interlocutory appeals, including circumstances where "serious, perhaps irreparable consequence[s]" are threatened which can be "effectually challenged only by immediate appeal." *Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 997, 67 L.Ed.2d 59 (1981) (quotations omitted).

While the court is reluctant to create piecemeal litigation, it does recognize that bankruptcy proceedings can extend over a period of years. The First Circuit itself has acknowledged that the bankruptcy context requires a more flexible view of finality. *See In re American Colonial Broadcasting,* 758 F.2d at 801. Although the court cannot overstate the maxim that permissive appeal should be made available " 'sparingly and only in exceptional circumstances,' " it finds that the combination of threatened, continuing injury over a prolonged period of time justifies the exercise of the court's discretion in this case. *Northeast Sav.,* 191 B.R. at 278 (quoting *McGillicuddy v. Clements,* 746 F.2d 76, 76 n. 1 (1st Cir.1984)). Moreover, the merits of this appeal neither slows or affects the progress of the proceedings below. It is for these reasons the court granted appellants leave to appeal.[7]

**B. Standard of Review**

 Having concluded that this court may exercise jurisdiction over this matter, it is necessary that this court delineate the appropriate standard for its review. The imposition of sanctions is generally reviewed only for abuse of discretion. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 55, 111 S.Ct. 2123, 2138, 115 L.Ed.2d 27 (1991) (exercise of inherent authority); *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976) (per curiam) (Rule 37). In this context, a sanctioning court necessarily abuses its discretion when it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). However, absent these latter types of mistakes, the choice and severity of the sanction imposed is a matter reserved to the sanctioning court's discretion as it is far better situated to evaluate the evidence presented and to apply the appro-priate legal standards. *See Whitney Bros. Co. v. Sprafkin,* 60 F.3d 8, 12 (1st Cir.1995); *Kale v. Combined Ins. Co.,* 861 F.2d 746, 758 (1st Cir.1988). Thus, this court's inquiry is not whether it would have employed the same measures, but whether the bankruptcy court's actions can be legally justified in light of the circumstances presented.

**C. Due Process**

 Appellants Cannon and Blagg both invoke the fundamental principles of due process in arguing that they were deprived of notice and an opportunity to be heard before the bankruptcy court took adverse judicial action against them. They claim the court below ambushed them by not stating in advance that it intended to sanction them personally, either monetarily or by published reprimand. Consequently, they argue that they had no meaningful opportunity to defend themselves in their personal capacities. The bankruptcy court called these contentions "borderline frivolous." *Williams II,* 188 B.R. at 728. This court is inclined to agree.

While there is indeed "no principle ... more fundamental to our system of judicial administration than that a person is entitled to notice before adverse judicial action is taken against him," *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 608 (1st Cir.), *cert. denied,* 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995), this court has a hard time accepting that Cannon and Blagg were deprived of either effective notice or a forum in which to respond to the allegations for their respective roles in this affair. The debtor timely served on the government a motion to preclude averring that the government failed to produce the partnership audit files in violation of a court order. Although the motion was not also captioned by the accessory language "pursuant to Bankruptcy Rule 7037 and Fed.R.Civ.P. 37(b)," the motion was unmistakably one for sanctions.

---

**7.** In granting appellants' motion, the court was primarily concerned with the bankruptcy court's published findings. However, because the monetary sanction is so interrelated with the issues posed by the published criticisms, the court exercises pendent appellant jurisdiction over the $750 monetary sanction. *See In re Tutu Wells Contamination Litigation,* 120 F.3d 368, 382 (3d Cir.1997); 16 Wright, Miller, & Cooper, Federal Practice and Procedure, § 3937, at 690–96 (2d ed.1996).

In preparation for the hearing on the motion, the government filed a pretrial memorandum, signed by appellant Cannon, which acknowledged that the nonproduction of the partnership audit files was in issue and that the bankruptcy court would be making factual findings as to the government's "diligence," "fault," and "good faith." The pretrial memorandum also recognized that the debtor was seeking preclusion as a sanction or "some other sanction pursuant to Rule 37(b) of the Federal Rules of Civil Procedure and Rule 7037(b) of the Bankruptcy Rules." It is simply incredible that Cannon, of all people, can assert he was not on notice of the nature of the allegations set for hearing. Documents do not produce themselves. Allegations of bad faith government misconduct necessarily implicates the conduct of the government actors involved, and there is nothing novel in sanctioning attorneys personally for discovery abuse.

Blagg hardly stands on more solid ground. He was assigned and accepted an integral role in collecting the documents. He acted as the liaison between the IRS and debtor's counsel. He attended the hearing as the designated representative of the IRS, and, in this capacity, was represented by Cannon. This court is unpersuaded, given Blagg's level of involvement in this case—a case in which he knew he was being called to testify—that he had no notice that the court might assign some level of responsibility to him personally. He knew that the debtor averred that the partnership audit files had not been produced, and he knew that the court would be most interested to know, if this allegation were proven true, why.

Notwithstanding clear and obvious notice that sanctions were under consideration, appellants assign error to the bankruptcy court because it did not inform them in advance of the measures it intended to take. They assert that courts must give particularized notice before imposing any type of sanction. For this proposition, they rely on *Simmerman v. Corino,* 27 F.3d 58 (3d Cir.1994).

In *Simmerman,* the court held that prior to the imposition of sanctions, a party is *per se* entitled to particularized notice of

(1) the fact that ... sanctions are under consideration, (2) the reasons why sanctions are under consideration, and (3) the form of sanctions under consideration.

*Id.* at 64. This principle is now well established in the Third Circuit, *see, e.g., In re Tutu Wells,* 120 F.3d at 379; *Martin v, Brown,* 63 F.3d 1252, 1262–63 (3d Cir.1995), and finds support elsewhere as well, *see Jensen v. Federal Land Bank of Omaha,* 882 F.2d 340, 341 (8th Cir.1989); *Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.,* 834 F.2d 833, 836 n. 5 (9th Cir.1987). However, the court does not find this principle to be in accordance with the precedent of this circuit.

In *Media Duplication Servs., Ltd. v. HDG Software, Inc.,* 928 F.2d 1228 (1st Cir.1991), the First Circuit expressed only a "general desirability and sometime necessity" of notice and a hearing before a court imposes sanctions for bad faith conduct. *Id.* at 1238. "In general, a higher standard of due process protection is required where ... a sanction is designed to go beyond compensation and punish an attorney"; however, so long as counsel is "given *some* opportunity to justify his actions" the requirements of due process are met. *Id.* at 1238–39 (emphasis in original). The *Media Duplication* court specifically eschewed any *per se* requirement for notice before a court imposes sanctions on an attorney personally for discovery abuse. *See id.* Rather, in the context of sanctions, the amount of process due varies according to the severity of the sanction and the circumstances of each individual case. *See Media Duplication,* 928 F.2d at 1238; *Muthig v. Brant Point Nantucket, Inc.,* 838 F.2d 600, 606–07 (1st Cir.1988). Given this flexible standard, the court has no apprehensions that either attorney's rights were unfairly trammeled.

A thorough review of the transcript reveals that the bankruptcy court accorded all of the individuals involved more than an ample opportunity to relate their versions of events and to justify their actions. Stein testified; Blagg testified; Cannon elected not to.[8] And

---

8. Apparently, Cannon did not testify to avoid

placing his credibility as a witness in issue in

despite his "not testifying," Cannon freely interjected his recollections of events when factual discrepancies arose. At several points during Stein's testimony, Cannon, even though an advocate, corrected Stein's testimony "for the record" Moreover, as shall be seen, the court's remarks were not unduly severe in light of the conduct involved. All of these facts lead the court to conclude that Cannon and Blagg had a fair hearing within the confines of *Media Duplication.*

Moreover, the court does not find any due process violation resulting from the bankruptcy court's refusal to consider appellants' post-judgment affidavits. Nor was the court under any obligation to meet with representatives from the Justice Department to better understand the testimony that was heard. Due process does not require that disappointed litigants or their attorneys have a second opportunity to litigate factual issues once a full and fair hearing has been provided. The government and their agents had an opportunity to persuade the bankruptcy court that they acted in good faith during the discovery process. They did not.

The bankruptcy court acknowledged that it made factual errors in its first decision. It corrected those errors on the record facts and noted them in an amended judgment. The court finds no error in the bankruptcy court's application of the standards for reconsideration under Bankruptcy Rule 9023. *See Williams II,* 188 B.R. at 725 (citing *In re Almacs, Inc.,* 181 B.R. 143, 143–44 (Bankr. D.R.I.1995)).

### D. The Sanctions Imposed

Turning now to the sanctions imposed, the court reviews the record below to make sure

that the bankruptcy court had the authority to sanction the attorneys as it did and that it did not abuse its discretion in the exercise of its authority.

### 1. The Monetary Sanction

With respect to the sole monetary sanction remaining, Cannon raises a bevy of procedural and legal issues. The court need not address all of his arguments in detail because this particular sanction, imposed pursuant to Rule 37(b)(3) for the nonproduction of the partnership audit files, suffers a basic infirmity: The court never issued a specific order compelling the production of the contents of these files.

▆▆▆▆▆ It is well settled that a court cannot impose sanctions pursuant to Rule 37(b)(2) unless and until a specific order pursuant to Rule 37(a) is issued and then violated. *See R.W. Int'l Corp. v. Welch Foods, Inc.,* 937 F.2d 11, 18 (1st Cir.1991); *Fleet Nat'l Bank v. Tellier,* 171 B.R. 478, 484 (D.R.I.1994). In this regard, the rules of discovery are mechanical. They set forth a systematic two-step process for the enforcement of their provisions. Like the "ball player" who cannot advance directly "from second base to home plate, without bothering to round, let alone touch, third base," a court may not utilize the more stringent measures described in Rule 37(b)(2) until it has specifically ordered the disclosure of particular discovery pursuant to Rule 37(a) and that command has been disobeyed. *R.W. Int'l,* 937 F.2d at 15. Although the parties led the court below on a fruitless odyssey of what transpired long after the deadline set by the bankruptcy court, to determine whether or

---

proceedings in which he was an advocate. *See* D.R.I. Loc. R. 4(d) (adopting R.I. Rules of Professional Conduct Rule 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness. ....")). Stein, on the other hand, testified and was cross-examined by a member of his firm. *See id.* (adopting R.I. Rules of Professional Conduct Rule 3.7(b) ("A lawyer may act as advocate at a trial in which another lawyer in the lawyer's firm is likely to be a necessary witness....")). In asserting that he was ethically constrained from offering the court his version of events, Cannon misunderstands the meaning and purpose of the, so-called, "advocate-witness" rule.

While this rule is not without great commentary, the general purpose of the rule is to avoid the appearance that, as advocates, lawyers may argue facts they know to be untrue. *See Culebras Enters., Corp. v. Rivera–Rios,* 846 F.2d 94, 99–100 (1st Cir.1988). It is not to shelter lawyers from their own misdeeds. If Cannon possessed material, first-hand knowledge about what transpired which was necessary to this matter, then he owed it *to his client,* to turn the reigns over to his colleague, Thomas Jones, also in attendance, rather than complain afterward that he was denied an opportunity to be heard.

not Cannon violated its discovery order, the court really did not need to look beyond the four corners of the order and the subsequent state of affairs on February 29, 1992.

Looking now at the bankruptcy court's order, which merely compelled the documents responsive to the debtor's April 30, 1991 request, this court finds that there is merit to Cannon's argument that the order did not specifically describe the partnership audit files. This defect is the result of the debtor's inartfully drawn request which did not describe the documents sought with "reasonable particularity." [9] Fed.R.Civ.P. 34(b). Examining the request, this court does not believe that a reasonable person, earnestly seeking to respond, would have known that the partnership audit files were requested. *See* 7 Moore's Federal Practice, § 34.11[3], 34–29 (3d. ed.1997); 8A Wright, Miller, & Cooper, Federal Practice and Procedure, § 2211, 415 (2d. ed.1994).

Debtor's counsel suggested several ways in which his original request could have been construed to describe the partnership audit files. For example, the debtor argued that the contents of the documents generated in connection with the AMPs settlement negotiations related to the extension of the statute of limitations because if a settlement had been entered into back in 1988, the statute would have run long ago. However, it strains the imagination to expect that a reasonable recipient of the debtor's request would have intuited that construction. To be sure, the far easier course of action would have been either for counsel to include a fifth category of documents in the original request or to serve upon the government a second request for the production of the partnership audit files. No doubt, Stein was aware of these options.

Assuming a good faith attempt to comply with the bankruptcy court's order, the court concludes that reasonable persons, such as Cannon or Blagg, would not have known to send the partnership audit files on or before February 28, 1992. Accordingly, the $750 monetary sanction must be vacated. The court's findings of fact, however, need not be disturbed.

### 2. Public Reprimand

The bankruptcy court's findings, based on conduct irrelevant to the Rule 37 issue, are not factually erroneous and can be sustained on the record before this court. The evidence before the court below indicates behavior which, although not in violation of the discovery rules *per se,* violated the spirit of the rules and wasted much of the court's scarce resources. Fundamentally, what the bankruptcy court heard was substantial evidence that Cannon and Blagg, among others, made promises that they did not keep. Indeed, Cannon has prevailed on a technical legal argument that the partnership audit files were not specifically subject to the January 14, 1992 order. The evidence was uncontroverted, however, that he promised these materials and did not deliver.

The power of courts to state publicly and publish their findings and opinions is a power "necessary to the exercise of all others." *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812); *see also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980). Not conferred by a specific rule or statute, this power is inherent in a court's ability to manage its own affairs, discipline the attorneys appearing before it, and explain its reasoning " 'so as to achieve the orderly and expeditious disposition of cases.' " *Chambers v. NASCO, Inc.,* 501 U.S. at 43, 111 S.Ct. at 2132 (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 631, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962)). When confronted with conduct which is not sanctionable by particular discovery rules, courts have other means of redressing abusive or opprobrious discovery practices. They need not turn a blind eye to promises which are undisputably broken and which derail the proceedings before them for two and one half years. Publishing specific findings of bad faith is but one remedy the bankruptcy court had available. *See Bank of Nova Scotia v. United States,* 487 U.S. at 263, 108 S.Ct. at 2378; *United States v. Hasting,* 461 U.S. at

**9.** Stein testified that this document was a boiler- plate request generated from his word processor.

506 n. 5, 103 S.Ct. at 1979 n. 5; *Horn*, 29 F.3d at 758 n. 1.

Like all judges, bankruptcy judges sometimes must make difficult determinations as to the credibility of witnesses and the forthrightness of attorneys. Indeed, sometimes such findings operate as a sanction. However, "a primary aspect" of the inherent authority vested in courts is "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45, 111 S.Ct. at 2133. Here, the court has no qualms with the bankruptcy court's findings, whether or not they are viewed as a sanction.

 It was uncontroverted that by May, 1992 Cannon and Blagg knew what documents the debtor was seeking. He had filed not one, but two, dispositive motions which set forth what materials he thought he had requested. Both Cannon and Blagg discussed the matter with Stein, and whether or not Blagg liked it, the government had *promised*, as early as June, 1992, that Stein could see any nonprivileged materials contained in the partnership audit files. This promise was reaffirmed by Cannon on several occasions and in correspondence by others in the Justice Department. What the bankruptcy court came to learn, after it indulged the government numerous extensions and continuances to gather the requested materials, was that these government actors did not keep their word. Two and a half years passed with the debtor and the court relying on the government's representations. In the end, the government offered the bankruptcy court a technical legal explanation that these materials had not been *formally* requested in 1991. Quite understandably, the bankruptcy court was not impressed, nor should it have been.

Whether conduct is in violation of a standing discovery order or in breach of an informal agreement, the evidence before the bankruptcy court fully supports the finding that appellants' conduct was "intentional, unprofessional, and unjustified." As a sanction, the court made known its findings and exposed those persons who it perceived were to blame. *See Jones v. Winnepesaukee Realty*, 990 F.2d 1, 5–6 (1st Cir.1993) (deterring parties and other litigants from abusive behavior displayed is valid use of sanctioning power). This court discerns no error either in the choice or the severity of the sanction imposed. The bankruptcy court's findings are left in tact.

### E. Remaining Issues

Having vacated the $750 monetary sanction, this court has no cause to consider the arguments of the government appellants that the bankruptcy court exceeded its authority by enjoining appellants Blagg and Cannon from seeking reimbursement from their employer, the United States.

Likewise, because the court has concluded that the record facts justify the bankruptcy court's finding of bad faith, there is no need to remand the case for further proceedings in this matter. Appellants' request that the case be reassigned to a different judge for further fact–finding is therefore *denied.*

### III. CONCLUSION

The record has been set straight. Attorneys Cannon and Blagg did not, in fact, violate an order of the bankruptcy court to produce certain documents. However, they did not act entirely in good faith. The bankruptcy court's legal conclusion that Cannon and Blagg violated the rules of discovery was erroneous. However, the court's factual findings that the appellants prolonged already protracted proceedings by making promises which they did not keep are fully supported by the record. The $750 sanction against appellant Cannon is *vacated.* Appellant Blagg's alternative petition for mandamus is *denied.* The appeal of the United States, Janet Reno, and Robert Rubin is *dismissed.* In all other respects, the amended judgment of the bankruptcy court is *affirmed.*

SO ORDERED.